Opinion for the court filed by Circuit Judge BRYSON. Dissenting opinion filed by Circuit Judge NEWMAN.
BRYSON, Circuit Judge.
Plaintiff Hoffmann-La Roche, Inc., (“Roche”) appeals from the decision of the United States District Court for the District of New Jersey granting the defendant generic drug companies summary judgment of invalidity as to claims 1-8 of U.S. Patent No. 7,718,634 (“the '634 patent”) and claims 1-10 of U.S. Patent No. 7,410,-957 (“the '957 patent”). We affirm.
I
The patents at issue in this appeal are directed to methods of treating osteoporosis through the once monthly administration of ibandronate, one of a class of compounds known as bisphosphonates. Ibandronate, a salt of ibandronic acid, is commercially available as Roche’s once monthly Boniva®, which was approved by the United States Food and Drug Administration (“FDA”) in 2005 for the treatment of osteoporosis. Once monthly Bo- *1328 niva® provides a 150 milligram (“mg”) dose of ibandronate.
Osteoporosis is a disease characterized by abnormal bone resorption. Resorption, the biological process by which bone is broken down, causes decreased bone strength and an increased risk of fractures. Bisphosphonates are “potent inhibitors of bone resorption.” '957 patent, col. 1, 11. 39-40. They inhibit abnormal bone destruction and enable the gradual restoration of lost bone mineral density (“BMD”).
Bisphosphonates are generally known to have a low bioavailability when administered orally, i.e., only a small fraction of a given dose is absorbed into the blood. Additionally, oral administration of bisphos-phonates can result in adverse esophageal and gastrointestinal side effects. As a result of the side effects and to improve the bioavailability of the drug, patients taking bisphosphonates must adhere to a dosing regimen that requires a bisphosphonate tablet to be taken in a fasting state at least 30 minutes before eating or drinking. In the past, the inconvenience of that regimen created problems of patient compliance. Researchers in the field believed that less-frequent dosing would result in patients continuing the treatment for the long term, which is required for bisphosphonate treatments to be successful.
Roche owns the '634 patent and the '957 patent, which is the parent of the '634 patent. Claims 1-8 of the '634 patent and claims 1-10 of the '957 patent are at issue in this case and describe a method of treating osteoporosis consisting of orally administering about 150 mg of ibandronic acid once monthly on a single day. Claim 1 of the '634 patent is representative of the claims on appeal:
1. A method for treating or inhibiting postmenopausal osteoporosis in a postmenopausal woman in need of treatment or inhibition of postmenopausal osteoporosis by administration of a pharmaceu-tically acceptable salt of ibandronic acid, comprising:
(a) commencing the administration of the pharmaceutically acceptable salt of ibandronic acid by orally administering to the postmenopausal woman, on a single day, a first dose in the form of a tablet, wherein the tablet comprises an amount of the pharmaceutically acceptable salt of ibandronic acid that is equivalent to about 150 mg of ibandronic acid; and
(b) continuing the administration by orally administering, once monthly on a single day, a tablet comprising an amount of the pharmaceuti-cally acceptable salt of ibandronic acid that is equivalent to about 150 mg of ibandronic acid.
II
The defendants in this case are generic drug manufacturers who submitted Abbreviated New Drug Applications (“ANDAs”) to the FDA for approval to engage in the manufacture and sale of generic versions of Boniva® prior to the expiration of Roche’s patents. Roche sued the defendants in the United States District Court for the District of New Jersey alleging infringement under 35 U.S.C. § 271(e)(2) based on the defendants’ ANDA filings.
Roche moved for a preliminary injunction. The district court denied the motion, holding that Roche had failed to prove it was likely to succeed in defeating the defendants’ obviousness challenge. This court affirmed the district court’s denial of the preliminary injunction. See Hoffmann-La Roche Inc. v. Apotex Inc., 496 Fed.Appx. 46 (Fed.Cir.2012).
*1329 While the appeal of the preliminary injunction decision was pending, the district court granted the defendants’ motion for summary judgment of invalidity of claims 1-8 of the '634 patent due to obviousness under 35 U.S.C. § 103(a). As to the frequency of dosing, the court found that once monthly oral dosing of ibandronate was established in the prior art. As to the amount of the monthly dose, the court found that the combination of several prior art references suggested a dosage level of about 150 mg per month, or at least indicated that a monthly dose of 150 mg was obvious to try.
The district court considered Roche’s evidence of objective considerations of non-obviousness but concluded that “Roche’s objective considerations evidence does not rise to the level of a mere scintilla, and it is not sufficient to defeat the motion for summary judgment.” In response to Roche’s argument that the 150 mg once monthly dose gave results that were superior to a 2.5 mg daily dose, the court found that Roche had “pointed to no evidence in support of [its] claim that the skilled artisan would have been surprised that the 150 mg once-monthly dose was superior to the 2.5 mg daily dose.” The court refused to consider contentions, raised at oral argument, that the 150 mg dose had a superior and unexpected level of bioavailability, because Roche had not raised that argument in its opposition brief.
Pursuant to Federal Rule of Civil Procedure 56(f) the court then raised, on its own motion, the issue of summary judgment of invalidity of claims 1-10 of the '957 patent. After considering the parties’ submissions, the court held those claims invalid for the same reasons that applied to the claims of the '634 patent. Roche argued that it was unexpected that an intermittent ibandro-nate regimen would be effective in reducing fractures. But the court concluded that the evidence on which Roche relied failed to show that a person of skill in the art would not have had a reasonable expectation that the patented method would succeed in reducing fractures. The court explained that “empirical confirmation that a method for increasing bone mineral density helps increase bone strength enough that bones break less easily would not appear to be all that surprising.”
In its motion for reconsideration, Roche argued that the district court had improperly failed to consider evidence that the 150 mg dose of ibandronate showed an unexpected level of bioavailability as compared with lower doses. On the merits of that argument, the district court found that the “evidence that the 150mg dosage was absorbed better by the body simply has no relevance to the core finding that the difference between the 150mg dose and the prior art was small” and that there was a reasonable expectation of success with the 150 mg dose.
Roche timely appealed the grants of summary judgment of obviousness.
Ill
The issue in this case is whether it would have been obvious at the time of invention to select a once monthly oral dosing regimen of ibandronate to treat osteoporosis and to set that dose at 150 mg.
A. Monthly Dosing
1. A relatively infrequent dosing schedule has long been viewed as a potential solution to the problem of patient compliance stemming from the inconvenience of oral bisphosphonate regimens. Fosa-max®, a prior art bisphosphonate product sold by Merck & Co., was administered weekly, and several prior art references taught once monthly oral dosing of iban-dronate or other bisphosphonates.
*1330 First, an article in the trade journal Lunar News entitled Update: Bisphospho-nates (“Lunar News”) stated that “[researchers are seeking solutions for better compliance,” including approaches that “use bisphosphonates with high potency yet low irritability, such as ... ibandro-nate (Roche). Oral agents could be given intermittently (once/month, for example) and still be quite potent.” Second, a 2001 article by Carey Krause in Chemical Market Reporter (“Krause”) disclosed that Roche would likely seek FDA approval of an “oral onee-monthly” formulation of ibandronate in 2003. Finally, United States Patent No. 6,468,559 (“Chen”) disclosed eoated-dosage forms of bisphos-phonic acids and methods for orally administering those dosage forms. Ibandronic acid was identified as one of many known bisphosphonic acids. Chen disclosed a preferred embodiment in which “a dosage form of the invention is administered to a patient ... preferably once a month.” Lunar News, Krause, and Chen therefore specifically taught the monthly administration of ibandronate.
Similarly, the prior art contained references to the monthly oral administration of bisphosphonates in general. United States Patent Application No.2003/0118634 (“Schofield”) taught dosing of “bone-active phosponate[s]” and referred to equivalent doses that “can be given every other day, twice a week, weekly, biweekly or monthly.” United States Patent No. 5,616,560 (“Geddes”) disclosed a bisphosphonate administration regimen in which “said bis-phosphonate is administered at least 1 day of every said thirty(30)-day treatment period.”
2. Roche argues that the art taught away from once monthly dosing because, according to Roche, it was widely believed as of the date of invention that a bisphos-phonate regimen with a dose-free interval longer than one or two weeks would not be effective. To support that contention, Roche primarily relies on the alleged failure of its intravenous ibandronate study (“Recker”) to demonstrate antifracture efficacy with quarterly dosing. Secondarily, Roche relies on a prior art article by Thomas Schnitzer (“Schnitzer”) speculating that the failure of the Recker study was due to the long dose-free interval.
The Recker study, however, showed a 26% reduction in vertebral fractures with intravenous ibandronate administered once every three months. The study was a “failure” only in the sense that the 26% reduction was statistically insignificant given the large number of patients that would have been required to reach a statistically significant conclusion about the relative rates of fractures in the control and subject groups. With respect to the reduction of hip fractures, for example, Recker concluded that “a meaningful conclusion with regard to efficacy could not be made owing to the low absolute number of hip fractures.” Recker’s failure to generate statistically significant results points to a fault in the study; it does not teach that infrequent ibandronate dosing is ineffective in treating osteoporosis.
The prior art references that interpreted Recker’s results demonstrate only that it was unknown why Recker was unsuccessful in demonstrating statistically significant antifracture efficacy. Schnitzer speculated that the long drug-free interval was to blame for the inconclusive results and that dosing intervals longer than one or two weeks would be ineffective. On the other hand, an article by Dr. Dennis Black (“Black”) described speculation that the doses used in Recker were too low. In fact, Roche itself subsequently acknowledged that the Recker study was under-dosed. Thus, Schnitzer’s speculation did not amount to an affirmative teaching *1331 away from monthly oral dosing of ibandro-nate, especially in the face of Black’s competing explanation of the Recker results.
Any doubt about the efficacy of oral ibandronate dosing that may have been created by Schnitzer’s speculation was put to rest by an article published in 2001 by Riis et al. entitled Ibandronate: A Comparison of Oral Daily Dosing Versus Intermittent Dosing in Postmenopausal Osteoporosis (“Riis”). Riis demonstrated that “intermittent ibandronate is as effective as the continuous treatment in terms of significantly increasing BMD at the spine and hip and suppressing markers of bone turnover.” Riis showed that increases in BMD equivalent to those obtained with a 2.5 mg per day treatment regimen were obtained with a regimen of 20 mg of ibandronate every other day for the first 24 days of every three-month period. Those results, Riis concluded, “confirm[ed] preelinical data showing that it is the total dose over a predefined period and not the dosing regimens that is the determining factor for effect on bone mass and architecture after ibandronate treatment.” Riis’s teaching that a dose-free interval of more than two months did not impact the BMD efficacy of ibandronate was directly contrary to Schnitzer’s speculation that such a dosing regimen would not be effective. Therefore, even if Schnitzer’s interpretation of the Recker study were viewed as teaching away from monthly dosing, Riis’s contrary findings substantially undermined that interpretation.
Roche argues that Riis did not overcome Schnitzer’s interpretation because Riis was not an antifracture trial. Roche argues that prior art focusing only on BMD and bone-turnover improvements, instead of on antifracture efficacy, does not bear on the obviousness analysis in this case because such prior art does not establish a reasonable expectation of success in reducing fracture risk.
While it is true that BMD improvements do not perfectly correlate with antifracture efficacy, it was well established in the art that BMD is a powerful surrogate for measuring fracture risk. For example, Roche’s own expert explained:
Bone mineral density is directly related to fracture risk. It is one of the most powerful surrogate markers in the field of medicine. It is as powerful an indicator of osteoporosis as blood pressure is a predictor of stroke. For every standard deviation reduction in bone mineral density, fracture risk is doubled.
Roche’s patents do not themselves present data demonstrating antifracture efficacy for a once monthly 150 mg dose. In fact, antifracture efficacy for Boniva® was demonstrated to the FDA through a “bridging study” that used BMD and bone turnover results — not antifracture testing — to establish the therapeutic noninferi-ority of the 150 mg monthly dose relative to the previously approved 2.5 mg daily dose, for which antifracture efficacy had been demonstrated.
Conclusive proof of efficacy is not necessary to show obviousness. All that is required is a reasonable expectation of success. See PharmaStem Therapeutics, Inc. v. ViaCell, Inc., 491 F.3d 1342, 1363-64 (Fed.Cir.2007); Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1364 (Fed.Cir.2007). Riis — along with other prior art that used BMD improvement as the primary efficacy marker for treating osteoporosis — established at least a reasonable expectation that once monthly dosing of ibandronate could successfully treat osteoporosis and reduce fracture risk.
B. Selecting the 150 mg Dose
1. Riis confirmed the total-dose concept whereby “the efficacy of ibandronate *1332 depends on the total oral dose given rather than on the dosing schedule.” Riis therefore teaches that in setting the dosage level for an intermittent ibandronate regimen, one need only scale up a known-effective dose from a short-interval regimen — e.g., daily dosing — to achieve approximately the same BMD and bone-loss efficacy with a long-interval regimen.
The prior art provided substantial guidance as to the total dose, within a given time period, that would produce effective results. A 1996 article by Ravn et al. (“Ravn”) reported the results of a study that measured BMD improvements and bone-turnover markers for daily ibandro-nate doses of 0.25 mg, 0.5 mg, 1.0 mg, 2.5 mg, and 5 mg. The authors concluded that the “average change in bone mass showed positive outcome in all regions in the groups receiving ibandronate 2.5 and 5.0 mg.” The 2.5 mg dose exhibited a response that was “virtually equal” to the 5 mg dose, even though it contained only half the amount of ibandronate. The 2.5 mg dose was thereby deemed the “most effective dose.”
A person skilled in the art looking to scale to a monthly dose of oral ibandronate from a known-effective daily dose was thus faced with a very limited set of possibilities: Of the five daily doses tested in Ravn, only the 2.5 and 5 mg doses “showed positive outcome in all regions.” Even though the 5 mg dose did not demonstrate greater efficacy than the 2.5 mg dose, it was still deemed an equivalently effective dose so that someone scaling it to a single monthly dose of 150 mg (5 mg/day x 30 days/month) would have anticipated equivalent success in raising BMD and limiting bone turnover, based on Riis.
Additionally, United States Patent No. 6,432,932 (“Daifotis”) disclosed weekly doses of ibandronate “from the group consisting of 35 mg, 40 mg, 45 mg, or 50 mg.” The 35 mg weekly dose corresponds to the same total dose as a 5 mg daily dose. The total-dose equivalent to 5 mg of ibandro-nate per day is thus the only dose that appears in both Ravn and Daifotis — suggesting that there was a reasonable expectation of success with the total-dose equivalents of the 5 mg daily dose, i.e., 150 mg per month.
Accordingly, the prior art pointed to a monthly treatment of 150 mg of ibandro-nate. At the very least, the 150 mg dose was obvious to try: There was a need to solve the problem of patient compliance by looking to less-frequent dosing regimens. And, based on Ravn and Daifotis, in light of Riis’s total-dose concept, there were only a “finite number of identified, predictable solutions.” KSR Int'l Co. v. Teleflex, 550 U.S. 398, 421, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007).
2. Roche contends that findings by the FDA taught away from further development of the 5 mg daily dose (and its total-dose equivalents) because the FDA approved a 2.5 mg daily dose of ibandronate instead of a 5 mg daily dose. But the FDA never made any findings contrary to the 5 mg daily dose, because it was never asked to approve that dose. Instead, in approving the 2.5 mg daily dose, the FDA merely restated the results of Ravn and concluded that “the 2.5 mg daily dose of ibandronate has the most favorable benefit — risk ratio and is the most appropriate dose for the prevention and treatment of postmenopausal osteoporosis.”
Roche next contends that Schofield taught away from using anything other than the lowest effective dose of a bisphos-phonate, which, according to Roche, was established by Ravn to be 2.5 mg for iban-dronate. Schofield, however, does not teach that the lowest effective dose is the only dose that should be used when treating osteoporosis with a bisphosphonate. *1333 Instead, Schofield merely defined the lowest effective dose as a measure of a drug’s potency relative to its therapeutic effects. Schofield then described a preferred embodiment of a method for treating bone disorders in which the maintenance dose of a “bone-active phosphonate” ranged from 2.5 to 15 mg per day. That range clearly encompasses more than just a lowest effective dose. Moreover, Ravn never purported to establish a lowest effective dose. Instead, it sought to establish a “most effective [daily] dose.”
Roche argues that the district court misinterpreted and misapplied the total-dose concept from Riis. According to Roche, the district court “took a technical leap” in finding that Riis’s total-dose concept implied only simple multiplication to scale from an efficacious daily dose to a monthly dose. The evidence before the district court, however, showed that the total-dose concept can be used as an effective rule of thumb by a person skilled in the art deciding how to scale to an efficacious intermittent dose of ibandronate. The Riis study, in particular, established that the total dose concept can reliably predict that the efficacy of an ibandronate treatment depends on the total dose administered to a patient over a given period, not on the amount administered at any single point in time. In light of that evidence, it was reasonable to expect that a once monthly dose of 150 mg would have roughly the same efficacy as a daily dose of 5 mg.
C. Safety of the 150 mg Dose
Roche next contends that there are disputed issues of fact as to whether it would have been obvious to administer once monthly doses of 150 mg in light of alleged safety concerns about the adverse gastrointestinal effects of ibandronate and other bisphosphonates.
First, Roche argues that Ravn taught away from further development of the 5 mg daily dose, and thereby its total-dose equivalents, because Ravn taught that the 2.5 mg daily dose was more effective than the 5 mg daily dose and had fewer side effects. Ravn, however, concluded that “the responses in the groups receiving 2.5 and 5 mg ibandronate were virtually equal,” not that the 2.5 mg dose was more effective. And although patients on the 5 mg daily dose dropped out of the study at a higher rate than patients on lower doses, Ravn did not conclude that the higher drop-out rate was statistically significant. Instead, the authors merely noted that a higher frequency of diarrhea was experienced with the 5 mg dose. A higher frequency of diarrhea does not necessarily teach away from the 5 mg daily dose or its equivalents, however, as the prior art indicated that modest gastrointestinal side effects must be weighed in light of the benefits of the drug. Indeed, Ravn itself concluded that “[i]n the present study, the side effect profile of ibandronate seemed to be safe” and that “[i]n general, the safety evaluation did not reveal any differences between ibandronate and placebo treated groups.”
Moreover, even if the higher incidence of diarrhea and the larger number of dropouts in the Ravn study were initially enough to teach away from further development of the 5 mg daily dose and its total dose equivalents, any such teaching away would have been overcome by Riis’s finding that an oral administration of 20 mg of ibandronate every other day for 24 days, followed by a nine-week rest phase, resulted in the same rate of side effects as a 2.5 mg daily regimen.
Aside from Ravn, Roche does not point to any references suggesting that there were safety concerns associated with the 150 mg dose. Nor was Roche’s expert, Dr. *1334 Harris, aware of anything that taught that a once monthly, 150 mg dose of ibandro-nate would be unsafe.
To the contrary, the prior art establishes that doses even higher than 150 mg were considered safe. United States Patent No. 6,143,326 (“Mockel”) stated that rapid-release ibandronate formulations showed “no significant side effects ... in clinical studies using ibandronate even at high dosages” and disclosed single-dose units up to 250 mg. Defendants’ expert, Dr. Yates, testified that the disclosures in Mockel would have led a person of ordinary skill in the art to understand that ibandronate doses up to 250 mg would be well tolerated. Likewise, Daifotis disclosed that “[f]or human oral compositions comprising ibandronate ... a unit dosage typically comprises from about 3.5 mg to about 200 mg of the ibandronate compound.”
There is thus no genuine issue of fact concerning whether the prior art taught away from the 150 mg dose based on safety concerns.
D. Unexpected Results
Roche argues that the district court erred by granting summary judgment of obviousness because the evidence of record showed that the 150 mg monthly dose was more effective than the 2.5 mg daily dose and that the superior effectiveness of the 150 mg monthly dose was unexpected. Roche also contends that ibandronate’s nonlinear bioavailability at the 150 mg dosage level was an unexpected result.
Roche’s MOBILE study, published in 2005, demonstrated that a 150 mg monthly dose is more effective than a 2.5 mg daily dose with respect to BMD improvement in the lumbar spine and most hip sites. The MOBILE study demonstrated, for example, a mean BMD improvement in the lumbar spine of 4.9% after one year for patients taking the 150 mg monthly dose and 3.9% after one year for patients taking the 2.5 mg daily dose. Another study published in 2005 showed that the extent of ibandronate’s bioavailability is nonlinear with increasing dosages: Increasing the oral dose by 50 percent, from 100 mg to 150 mg, resulted in a nearly 150 percent increase in the amount of the drug absorbed by the blood.
While the evidence would support a finding of superior efficacy of the 150 mg monthly dose in raising BMD levels, as compared to a 2.5 mg daily dose, that improved efficacy does not rebut the strong showing that the prior art disclosed monthly dosing and that there was a reason to set that dose at 150 mg. See In re Merck & Co., 800 F.2d 1091, 1099 (Fed.Cir. 1986). The evidence of superior efficacy does nothing to undercut the showing that there was a reasonable expectation of success with the 150 mg monthly dose, even if the level of success may have turned out to be somewhat greater than would have been expected.
For the same reasons, the nonlinear bioavailability of ibandronate does not rebut the prima facie showing of obviousness of a once monthly dose of 150 mg. The increased level of bioavailability has not been shown to be responsible for the improved osteoporosis treatment efficacy of the 150 mg dose. A study by Ravn et al. in 2002 showed, for example, that a near doubling of the blood-serum concentration of ibandronate with a 5 mg daily dose, compared to a 2.5 mg daily dose, produced no further BMD increase and no further reduction in bone turnover. Other record evidence confirms that “[d]ue to strong binding to the bone surface, the effects of the systemically available amount of a bisphosphonate are almost exclusively related to its concentration in bone rather than [blood] serum level.” *1335 The evidence regarding bioavailability is therefore of little relevance to the obviousness inquiry.
Accordingly, we uphold the judgment of the district court that claims 1-8 of the '634 patent and claims 1-10 of the '957 patent would have been obvious in light of the prior art and are therefore invalid.
AFFIRMED.